IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Mark Ballard,

   Plaintiff,

 v.

Chris Yuhas, *et al.*,

   Defendants.

Case No. 16 C 9663

Judge Jorge L. Alonso

## Memorandum Opinion and Order

Pending before the Court is Defendants' motion for summary judgment (ECF No. 119), which has been fully briefed. For the reasons below, the Court grants the motion and dismisses this case.

## Background[1]

In August 2014, Plaintiff Mark Ballard was arrested and became a pre-trial detainee at the Will County Adult Detention Facility (the "Jail") while his criminal case was pending in the Will County Circuit Court. (DSOF ¶ 4.) Upon admission, he received a copy of the Inmate Handbook and a property bin, which was a plastic tub with a lid that could store roughly two boxes' worth of copier paper. (*Id.* ¶¶ 5–6.) The Jail's practice and procedure was to allow inmates to keep property in their cells as long as the items fit in the property bin—any excess items needed to be stored in the Jail's Property Unit, which the inmate could request to be brought to him. (*Id.* ¶ 7.)

---

[1] This background is taken from the statements and responses the parties have submitted under this District's Local Rule 56.1. The Court refers to Defendants' statement of facts (ECF No. 121) as "DSOF" and refers to Ballard's response and statement of additional facts (ECF No. 125) as "Pl. Resp." and "PSOF," respectfully. The Court refers to Defendants' response to Ballard's statement of additional facts (ECF No. 127) as "Defs. Resp." Unless otherwise noted, these facts are either undisputed or presented from Ballard's point of view as the non-moving party.

Inmates who were pro se litigants in their criminal cases could request a second property bin in which to store legal papers.[2] (*Id.* ¶ 9.)

In or around October 2015, Ballard chose to represent himself in his criminal case, and he requested and received a second property bin. (*Id.* ¶ 12.) The Will County Circuit Court entered orders allowing Ballard to review the prosecution's discovery disclosures in his criminal case "per the jail's policy" and "within the ordinary course of business @ the WCADF." (*Id.* ¶ 13.) On one occasion on November 3, 2015, a property clerk brought Ballard three boxes of discovery from his criminal case, but Ballard refused the delivery so the boxes were returned to the Property Unit. (PSOF ¶ 7; *see also* Defs. Resp. ¶ 7.) On November 17, 2015, Ballard raised concerns during an appearance in his criminal case about accepting discovery materials without an itemization of those materials, and about not being able to listen to audio recordings included in the discovery because he was not allowed to use headphones from the Jail's bible study classroom. (DSOF ¶ 14.) The court directed the Jail to make it possible for Ballard to listen to the audio recordings with a speaker or with the headphones in the bible study classroom. (*Id.*) At that time, the Jail did not have its own set of headphones for inmates' use, because the headphones in the bible study classroom were property of the Center for Correctional Concerns, not the Jail. (*Id.* ¶ 15.)

Following this, Ballard requested on November 18, 2015 that the Jail comply with the court's order and provide him headphones, and Defendant Sergeant Mary Zaragoza and Defendant Sergeant Michelle Moffett responded on November 19, 2015 that the issue was being addressed. (PSOF ¶ 1.) According to Zaragoza the "issue was being addressed," and Defendant

---

[2] The parties dispute whether the Jail had a defined policy limiting pro se inmates to a maximum of two property bins.

Sergeant Moffett recalled that they would consult one another and probably were working on the issue, though it is possible that neither defendant notified the deputy chief of the issue. (Pl. Resp. ¶¶ 17–18; PSOF ¶ 12.) On November 20, 2015, Ballard submitted a request asking whether his family could provide him a set of headphones, and Moffett responded that "[t]his will be looked in to." (PSOF ¶ 2.) On December 7, 2015, Ballard requested during a court appearance that the Court allow his wife to bring a set of headphones to the Jail for him, and the Court ordered that Ballard be allowed to have headphones upon requesting them using a "22 form" and according to the Jail's rules, regulations, and policies. (Pl. Resp. ¶ 20; PSOF ¶ 3.) The Jail's regular procedure was to prohibit inmates from having personal property items delivered to the jail, except for approved medical equipment. (DSOF ¶ 21.) The Jail eventually obtained a set of headphones and provided them to Ballard by December 8, 2015. (*Id.* ¶ 19.)

In January 2016, Ballard filed motions in his criminal case (1) for the appointment and funding of a private investigator to assist him with his defense; and (2) for approval for payment of expert fees for a DNA expert, which were set for hearing on January 29, 2016. (*Id.* ¶ 22; PSOF ¶ 10.) On January 28, 2016, Defendant Correctional Officer Chris Yuhas was working as the pod officer in L Pod, where Ballard was housed. (DSOF ¶ 23.) That day, Yuhas noticed that Ballard had a pair of white shoes, and Ballard told Yuhas that he had the shoes pursuant to a doctor's order. (*Id.*) Yuhas checked his computer to see whether Ballard's file contained an active medical order for the shoes. (*Id.* ¶ 24.) Ballard had received white shoes to address his medical needs prior to March 31, 2015, and had requested and received a new pair of white shoes on March 31, 2015. (PSOF ¶ 17.) As shown in Ballard's medical file, he was formally prescribed the shoes for two months per a doctor's order dated August 6, 2015, and a Special Needs Treatment Form on August 6, 2015 stated that Ballard should continue wearing special shoes and did not have an

expiration date. (DSOF ¶ 26; Pl. Resp. ¶ 26; PSOF ¶ 19.) Ballard also had requested and received replacement white shoes on September 20, 2015 and December 9, 2015. (PSOF ¶ 21.) Yuhas checked Ballard's medical file, including his expired medical order and his Special Needs Treatment Form. (*Id.* ¶ 19; DSOF ¶¶ 24–25; Pl. Resp. ¶ 25.) Yuhas then went to Ballard's cell and took away his white shoes, though Ballard told Yuhas that he needed the shoes for a degenerative disc condition in his back. (DSOF ¶ 27; Pl. Resp. ¶ 28.) Ballard would later be re-prescribed white shoes on May 9, 2016 and consistently thereafter. (PSOF ¶ 22.)

     Also on January 28, 2016, Ballard had hundreds of pages of legal papers in his cell, more than would fit into his two property bins. (Pl. Resp. ¶ 29.) Yuhas initially told Ballard that Yuhas would take away all of his legal papers, but then told him prior to leaving for lunch that Yuhas would take from him any discovery he had out when Yuhas got back. (*Id.* ¶ 30.) Ballard objected and asked to speak with Defendant Sergeant Sicinski because a court order allowed him to keep all of his legal papers regardless of the amount. (DSOF ¶ 32; PSOF ¶ 14.) Sicinski came to the housing unit and Ballard asked him for permission to keep all of his legal papers until the next day, when Ballard would ask the court for an order allowing him to have a third property bin. (DSOF ¶ 33.) Sicinski disregarded Ballard's request and told him to return to his cell, and threatened to tell the judge in Ballard's criminal case that Ballard had cursed at one of the officers and that the judge then "won't give you [expletive]." (*Id.* ¶ 34; PSOF ¶ 15.) Then, while Yuhas was at lunch, Ballard put away all of his legal papers, and previously had placed some of his papers into his cellmate's property bin. (Pl. Resp. ¶ 35.) Yuhas later returned, searched Ballard's cell, and found the legal papers that Ballard had put in his cellmate's property bin. (DSOF ¶¶ 36–37.) Yuhas charged Ballard with a major rule violation for refusing to obey a direct order, and requested to transfer Ballard to segregated housing pending a disciplinary hearing,

4

which Sicinski approved. (*Id.* ¶ 39.) Ballard was escorted from L Pod's general population housing to segregated housing in D Pod. (*Id.* ¶ 40.)

Under the Jail's rules, inmates in segregated housing are allowed to have their legal papers—the regular procedure is to send the inmate's property bin to the Property Unit until the inmate submits a written request for his property. (*Id.* ¶¶ 41–43.) Because Ballard had told Yuhas and Sicinski that he had court the next day, they made an exception and planned to send one of Ballard's property bins directly to D Pod rather than to the Property Unit. (*Id.* ¶ 44.) Before sending the bins along, however, Yuhas inspected their contents to ensure that only legal papers would be sent directly to Ballard, and removed blank paper and blank forms from the bins.[3] (*Id.* ¶¶ 45–46.) Yuhas then contacted a correctional officer from the next shift and asked the officer to have Ballard's pro se property bin delivered directly from L Pod to D Pod. (DSOF ¶ 48.)

Later that day, Zaragoza learned of the requested delivery to Ballard, was unaware that Yuhas had already screened Ballard's pro se bin, and directed her property clerk to bring all of Ballard's property to the Property Unit rather than to D Pod. (*Id.* ¶¶ 49–50.) Had Zaragoza known that Yuhas had already screened Ballard's property bin, she would have directed her property clerk to deliver the bin directly to Ballard in D Pod without requiring a written request from him. (*Id.* ¶ 51.)

At Ballard's January 29, 2016 appearance in his criminal case, Ballard informed the court that he lacked access to his legal papers and, after the court refused to grant a continuance for arguing his two pending motions, he said, "I don't mind trying to argue this motion." (*Id.* ¶ 52; PSOF ¶¶ 26–27.) The Court then heard oral argument from Ballard and the prosecution regarding

---

[3] According to Ballard, Yuhas also discarded some of his discovery materials and legal papers, though that is based largely on inadmissible hearsay. (PSOF ¶ 25; Defs Resp. ¶ 25.)

his motions for payment of expert fees and for appointment of a private investigator, and denied both motions. (DSOF ¶ 53.) Ballard initially did not seek reconsideration of his motions (he believed the 're-litigation' doctrine precluded this), and at his deposition, Ballard did not specify any information he would have provided to the court at the motion hearing if he had his legal papers with him at that time. (*Id.* ¶¶ 54, 56.) In 2017 or 2018, Ballard renewed his request for the appointment of an investigator, which the court granted. (*Id.* ¶ 57.) An attorney also re-filed Ballard's motion for payment of expert fees on Ballard's behalf, which remains pending. (*Id.* ¶ 58.)

On January 31, 2016, a disciplinary hearing was conducted regarding Ballard's alleged refusal to obey a direct order from Yuhas. (*Id.* ¶ 62.) At the hearing, Ballard explained that the legal papers found in his cellmate's property bin had been placed there before Yuhas ordered him to put his papers away, and had not been touched. (Pl. Resp. ¶ 63.) The hearing officer (or hearing board) nevertheless rendered a guilty verdict and assigned Ballard a penalty of five days in disciplinary housing in D Pod, after which Ballard was moved to administrative segregation in I Pod. (DSOF ¶ 64.) Ballard submitted a grievance appealing the disciplinary guilty verdict, which Defendant Sergeant Moffett denied. (*Id.* ¶ 65.)

Had Ballard been charged and found guilty only of possessing an unauthorized amount of property or violating cell living area guidelines, rather than disobeying a direct order, he would have been guilty of a minor violation rather than a major violation, and thus would not have been eligible for disciplinary segregation.[4] (*See* PSOF ¶¶ 33–34.)

---

[4] According to Ballard, he effectively was found guilty of only a minor violation rather than a major violation given language in the hearing board's report that "placing any items in another inmates [sic] bin is an unauthorized transfer of property and a rules violation by itself." (*See* PSOF ¶ 35; ECF No. 121-20 at WCSO 0843.)

Inmates in administrative segregation at the Jail are confined to their cells for twenty-one hours per day and have approximately half the time available to use the law library compared to inmates in general population, but can keep two property bins in their cell if they are pro se litigants and can have additional property items brought to them from the Property Unit. (*Id.* ¶¶ 38–39; DSOF ¶ 67.)

On February 3, 2016, Defendant Correctional Officer Derrick Albin was assigned to I Pod where Ballard was housed. (DSOF ¶ 68.) Per Ballard's request, a property clerk brought all of Ballard's property from the Property Unit to I Pod. (*Id.* ¶ 69.) Albin spoke to Zaragoza, who told Albin to let Ballard go through his property and decide what he wants to keep in his two property bins and what he wants to instead store in the Property Unit. (*Id.* ¶ 70.) The property delivered by the property clerk to Ballard consisted of Ballard's two property bins and several large plastic bags. (*Id.* ¶ 71.) When Ballard's property arrived, Ballard wanted to take all of it to his cell, but Albin, on Zaragoza's instruction, made Ballard review it in the dayroom instead. (*Id.* ¶ 72; Pl. Resp. ¶ 73.) While Ballard sorted through his property in the dayroom, the other inmates were locked down in their cells. (DSOF ¶ 74.) After having only a "short"[5] period of time to sort through his property, Albin allowed Ballard to take his two property bins into his cell and returned the excess items to the Property Unit. (Pl. Resp. ¶ 75.)

In November 2022, Ballard filed a motion to dismiss his criminal charges, detailing items he contends the prosecution failed to disclose. (DSOF ¶ 59.) Ballard also believes there may be defenses he will be unable to assert in his criminal case as a result of Defendants' conduct,

---

[5] Defendants offer some evidence that Ballard was perhaps given an hour to review his property. (*See* Defs. Resp. ¶ 29; ECF No. 121-3 at 56:12–21.)

though he admits he cannot be certain of this until the trial takes place. (*Id.* ¶ 60.) As of February 2023, no trial date has been set in Ballard's criminal case. (*Id.* ¶ 61.)

In 2016, Ballard filed his instant action in this Court. (*See* ECF No. 1.) In his operative amended complaint, Ballard brings various claims under 42 U.S.C. § 1983 related to Defendants' conduct. (*See* ECF No. 12.) Specifically, Ballard claims that Defendants (1) infringed his right of access to the courts by confiscating his legal materials on January 28, 2016 and by destroying his legal materials and enforcing an alleged property limit that prevented him from marshalling all evidence in his defense; (2) punished him without due process under the Fourteenth Amendment to the U.S. Constitution by penalizing him for a major rule violation rather than a minor rule violation; and (3) were deliberately indifferent to his serious medical needs under the Fourteenth Amendment by confiscating his white shoes.

Following discovery, Defendants collectively filed a motion for summary judgment as to Ballard's claims (ECF No. 119), which has been fully briefed.

**Legal Standard**

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Summary judgment is the proverbial put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020) (internal quotation marks omitted). "To defeat a motion for summary judgment, the party opposing it must make a 'showing

8

sufficient to establish the existence of [any challenged] element essential to the party's case, and on which that party will bear the burden of proof at trial.'" *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893–94 (7th Cir. 2018) (quoting *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). The court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

In assessing the evidence at summary judgment, the court must consider the facts in the light most favorable to the non-moving party, giving that party "the benefit of all conflicts in the evidence and reasonable inferences that may be drawn from the evidence," regardless of whether it can "vouch for the objective accuracy of all" the evidence the non-moving party puts forward. *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 674 (7th Cir. 2014). Even though district courts must view the non-moving party's evidence in this generous light, it does not follow that they are "required to draw every requested inference; they must only draw reasonable ones that are supported by the record." *Omnicare*, 629 F.3d at 704. "Inferences supported only by speculation or conjecture will not suffice." *Johnson*, 892 F.3d at 894.

## Discussion

Defendants argue that they are entitled to summary judgment because Ballard's claims fail as a matter of law on the merits and because Defendants are entitled to qualified immunity.

Because the Court agrees that Defendants are entitled to qualified immunity, summary judgment in Defendants' favor is appropriate and the Court does not reach the other disputed issues.

"To defeat a defense of qualified immunity, the plaintiff must show two elements: first, that the facts show a violation of a constitutional right, and second, that the constitutional right was clearly established at the time of the alleged violation." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (internal quotation marks and citation omitted). Courts may "address the second question first if it simplifies the analysis." *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (citing *Person v. Callahan*, 555 U.S. 223, 232 (2009)). To be "clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right meaning that existing precedent must have placed the statutory or constitutional question beyond debate." *Leiser*, 933 F.3d at 701 (internal quotation marks and citation omitted). "[T]he plaintiff bears the burden of defeating [a qualified-immunity defense] either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 723–24 (7th Cir. 2013). "Both methods of inquiry into whether a right is clearly established . . . must be undertaken in light of the specific context of the case, not as a broad general proposition." *Lovett v. Herbert*, 907 F.3d 986, 992 (7th Cir. 2018) (internal quotation marks and citations omitted). "The clearly established right must be defined with specificity," and a court "analyze[s] whether precedent squarely governs the facts at issue, mindful that [it] cannot define clearly established law at too high a level of generality." *Smith v. Finkley*, 10 F.4th 725, 742 (7th Cir. 2021) (internal quotation marks and citations omitted).

Here, Ballard has not provided a basis for the Court to conclude that Defendants violated his clearly established rights, even taking the facts in the light most favorable to him. To argue that his allegedly violated rights were clearly established, Ballard points only to high-level legal principles that (1) "prisoners have a constitutional right of access to the courts"; (2) "the Due Process Clause of the Fourteenth Amendment affords pretrial detainees the right to be free from punishment"; and (3) incarcerated persons have a "right to receive adequate medical treatment." (ECF No. 124 at 14.) This defines Ballard's rights far too broadly to defeat qualified immunity. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) ("We have repeatedly told courts . . . not to define clearly established law at a high level of generality." (citing cases)); *Brosseau v. Haugen*, 543 U.S. 194 (2004) ("[T]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (internal quotation marks and citation omitted)); *Leiser*, 933 F.3d at 702 ("[T]he right must be clearly established to a degree of specificity such that a reasonable government official would be able to identify the violation with a specific set of facts.").

Ballard does not explain how Defendants' particular conduct, even under Ballard's version of events, was a violation of clearly established law at the time of the conduct, whether based on analogous cases or otherwise. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) ("The dispositive question is whether the violative nature of *particular* conduct is clearly established." (emphasis in original) (internal quotation marks and citation omitted)). Instead, he merely cites basic, high-level doctrine untethered to the facts of this case and summarily reiterates that in the light most favorable to him "the facts show that Defendants infringed upon his constitutional rights." (ECF No. 124 at 14–15.). Ballard has not explained how Defendants' conduct violated

11

his *specific*, *clearly established* constitutional rights to preclude summary judgment. Qualified immunity thus applies, and Ballard's claims must be dismissed.

## Conclusion

For the above reasons, the Court grants Defendants' motion for summary judgment (ECF No. 119) and dismisses Ballard's claims. The Court will enter final judgment.

**SO ORDERED.**                                                                 **ENTERED: September 6, 2023**

_____

**HON. JORGE ALONSO**
**United States District Judge**